## STATE OF MISSOURI, Plaintiff in Error, v. DALTON and FAY, Defendants in Error.

### St. Louis Court of Appeals, December 29, 1908.

1. CONSPIRACIES: Common Law: Statutory Conspiracy. By virtue of section 4151, Revised Statutes 1899, the common law relating to criminal conspiracies obtained in this State before the enactment of special statutes upon the subject, Sections 2152 and 2153, Revised Statutes 1899; and the common law rules relating to conspiracies still prevail unless abrogated by the last-mentioned statutes.

2. LAWS: Common Law: Statutory Repeal of Common Law. The common law upon any subject can be repealed by statute by express words, or it may be repealed by implication. A repeal by implication can take place only where the statute is so repugnant to the common law that both cannot operate at the same time, or where the statute is such a revision of the whole subject-matter that an intention is manifest to substitute the statute for the common law rules.

3. ———: ———: Statutory Construction. A statute in derogation of the common law must be construed strictly.

4. CONSPIRACIES: Common Law: Statutory Repeal of Common Law. Our statutes relating to conspiracies are not repugnant to the common law on the subject, nor do they purport to exhaust the subject, but are only a modification of the common law in some particulars and do not supersede the common law in matters not included in the terms of the statute.

5. ————: ————: Definition. A conspiracy at common law takes place where there is a corrupt combination for the purpose of doing a wrongful act or for the purpose of doing a lawful act by unlawful means.

6. ————: ————: ————. As a general proposition where additional power to accomplish an injurious purpose arises by reason of concert of action, the act contemplated may be criminal as a conspiracy, if the means or the purpose are unlawful, although the same means or the same end would not necessarily be indictable if performed by an individual.

7. ————: ————: ————: Specific Case. Where persons entered into a conspiracy for the purpose of inducing the employees of another to quit the other's service and extorted from the other a sum of money in consideration of withdrawing such influence from the employees, this was a criminal conspiracy at common law and the parties were indictable for such offense in this State; likewise where such persons conspired to prevent the employees from taking service with another and extorted from that other money as the price of withdrawing their influence, their acts constituted criminal conspiracy.

Appeal from St. Louis Court of Criminal Correction.— *Hon. Ellison A. Taylor,* Judge.

REVERSED AND REMANDED.

*Perry Post Taylor* and *John D. Dalton* for plaintiff in error.

(1) Common law conspiracy is still punishable as a misdemeanor in this State, despite the fact that the statute (R. S. 1899, sec. 2152), defines certain acts as conspiracies, because there is no provision in our statute containing "negative or exclusive words." Our statute "neither in terms abolishes the common-law offense, nor does it declare that the cases enumerated shall alone constitute the offense." "When the com-

mon law and a statute differ, the common law gives place to the statute, only when the latter is couched in negative terms, or where its matter is so clearly repugnant that it necessarily implies a negative." State v. Norton, 23 N. J. 40; 2 Bishop, New Criminal Law (8th Ed.), pp. 134, 135. (2) The common law, so far as not repugnant to our local positive law prevails in Missouri. Brandon v. Carter, 119 Mo. 572; State v. Phipps, 34 Mo. App. 400. (3) Criminal conspiracy is a "confederating of two or more persons to accomplish some unlawful purpose, or a lawful purpose by some unlawful means." 2 Bishop on Criminal Law (Ed., 1892), sec. 175; Commonwealth v. Hunt, 4 Met. (Mass.), 123; Hart v. Hicks, 129 Mo. 104; Carew v. Rutherford, 106 Mass. 1, 8 Am. Rep. 291. (4) Even if it were conceded that, in thus procuring Burke's money, the defendants were guilty of a felony, yet they can be punished for the offense described in the indictment—the conspiracy. 1 Bishop's New Criminal Law (8 Ed.), sec. 814; State v. Setter, 57 Conn. 461; State v. Bradley, 48 Conn. 535; State v. Gannon, 75 Conn. 206; Com. v. Walker, 108 Mass. 309; State v. Sias, 17 N. H. 558; Whitford v. State, 24 Tex. App. 489; Bailey v. State (Tex.), 59 S. W. 900; U. S. v. Rindskopf, 6 Biss. (U. S.) 259; U. S. v. Goldman, 3 Woods (U. S.) 187.

*C. J. Anderson* for defendants in error.

(1) The defendant in each of its counts is vague, indefinite and uncertain, and fails to state any offense either under the common law or under the statutes of this State, and fails to inform the defendants of the offense with which they are charged. R. S. 1899, sec. 2125; State v. Boogher, 71 Mo. 631; State v. Slaughter, 70 Mo. 484; Young v. Railroad, 33 Mo. App. 509. (2) The indictment attempts to charge conspiracy but does not charge this offense as it is defined by the statutes of this State. The agreement must be

to do some act embraced in the definition of the offense. 1 Whart., Cr. L. (8 Ed.), sec. 1342; 2 Bishop, Cr. L. (6 Ed.), sec. 186. It cannot charge conspiracy under the common law as the common law on the subject is repealed by the enactment of section 2152, Revised Statutes 1899. State v. Boogher, 71 Mo. 631; State v. Slaughter, 70 Mo. 484. (3) The indictment also attempts to charge the defendants with obtaining $200 from Burke. If this offense was committed it would amount to a felony and the alleged conspiracy, a misdemeanor, would be merged into the greater offense. R. S. 1899, sec. 1895; Wright v. State, 5 Ind. 527; Com. v. Blackburn, 1 Duv. (Ky.) 4; State v. Mayberry, 48 Me. 218; Elkin v. People, 24 How. Pr. 272; Shannon v. Com., 14 Pa. 226.

STATEMENT.—The defendants were jointly indicted on a charge of conspiracy by the grand jury in the circuit court of the city of St. Louis. In accord with the statute in cases of misdemeanor, the indictment was duly transferred to the court of criminal correction for further proceedings thereon. The defendants being duly arraigned in that court, entered a plea of not guilty. Afterwards their motion to quash the indictment on the ground of its insufficiency to charge an offense against the laws of this State was sustained by the court, the indictment was quashed and final judgment given thereon, by which the defendants were discharged. From this judgment the State prosecutes a writ of error in this court, under authority of sections 2711 and 2709, R. S. 1899, secs. 2711 and 2709, Mo. Ann. St. 1906. The question for decision is the sufficiency of the facts stated in the indictment to constitute an offense under the laws of Missouri.

Omitting caption and signatures, the indictment is as follows:

The grand jurors of the State of Missouri within and for the body of the city of St. Louis, now here in

court, duly impaneled, sworn and charged, upon their oath present, that one, William Burke, on the twenty-first day of April, nineteen hundred and five, was a plumber and plumbing contractor in the city of St. Louis, engaged in the business of general plumbing and contracting work, and doing plumbing work on contract and then and there had contracts to do a large amount of plumbing work in and about certain buildings, to-wit, one building at Number 5013 and 5015 Delmar avenue, and one building at Number 4139 Maffitt avenue, both in said city of St. Louis, then and there being constructed, and that in and about his said business of doing said contract-work and executing said contract, he, the said William Burke, employed and then and there had in his employ two journeymen plumbers, to-wit, Charles Lambert and Cornelius L. Crowley;

"And that on or about the said twenty-first day of April, nineteen hundred and five,

"Charles J. Dalton and Franklin C. Fay intending unlawfully, fraudulently, and deceitfully to extort, obtain and procure of and from the said William Burke a large sum of money for the use of themselves and others, whose names are to these grand jurors unknown, and in order to extort, obtain and procure said large sum of money, did, at the city of St. Louis, unlawfully and corruptly conspire to cause, procure and induce the said journeyman plumbers, who were then and there in the employ of said William Burke, in and about the execution and performance of the aforesaid contracts, to stop and quit the employment of the said William Burke, and to stop their work for said William Burke in and about the execution and performance of said contracts, and to thereby hinder and delay the said William Burke in the execution and performance of said contracts.

"And that the said Charles J. Dalton and Franklin C. Fay, in furtherance of their conspiracy aforesaid, on the said twenty-first day of April, 1905, at the city of St. Louis aforesaid, did corruptly and unlawfully in-

duce the said journeymen plumbers so employed by the said William Burke as aforesaid, to quit the employment of the said William Burke, and to hinder, delay and prevent the said William Burke in the execution of said contract aforesaid, and then and there did, in the furtherance of their conspiracy, state and represent to the said William Burke, that unless he, the said William Burke, would then and there pay to them, the said Charles J. Dalton and Franklin C. Fay, the sum of two hundred ($200) dollars, lawful money of the United States for the use of themselves and said others, then the said Charles J. Dalton and Franklin C. Fay would prevent the said journeymen plumbers from again resuming the employment of the said William Burke and the said Charles J. Dalton and Franklin C. Fay, in furtherance of their said conspiracy, then and there did corruptly, wickedly and willfully, obtain for the use of themselves and said others, from the said William Burke, the sum of two hundred ($200) dollars lawful money of the United States of the property of him, the said William Burke, against the peace and dignity of the State.

"And the grand jury aforesaid upon their oath, aforesaid, do further present that one, William Burke, on the twenty-first day of April, nineteen hundred and five, was a plumber and plumbing contractor, in the city of St. Louis, engaged in the business of general plumbing and contracting work, and doing plumbing work on contract, and then and there had contracts to do a large amount of plumbing work in and about certain buildings, to-wit, one building at Numbers 5013 and 5015 Delmar avenue, and one building at Number 4139 Maffitt avenue, both in said city of St. Louis then and there being constructed, and that in and about his business of doing said contract work, the said William Burke had and employed two (2) journeymen plumbers, to-wit, Charles Lambert and Cornelius L. Crowley, and that on said twenty-first day of April, nineteen hundred and

five, at the said city of St. Louis, the said journeymen plumbers then in the employ of the said William Burke, in and about the work of executing the aforesaid contract did stop and quit the employment of the said William Burke;

"And that on the said twenty-first day of April, nineteen hundred and five, one Charles J. Dalton and Franklin C. Fay, well knowing the premises, and that said journeymen plumbers of said William Burke, had stopped and quit the employment of said William Burke, as aforesaid, and intending unlawfully, fraudulently and deceitfully to extort, obtain and procure of and from the said William Burke, a large sum of money for the use of themselves and others whose names were to these grand jurors unknown, on the said twenty-first day of April, nineteen hundred and five at the city of St. Louis, aforesaid, did corruptly, and unlawfully conspire together to extort, obtain and procure from and of the said William Burke, a large sum of money for the use of themselves and said others, to-wit, the sum of two hundred ($200) dollars, and in order to extort, obtain and procure the same, did in furtherance of their said conspiracy represent and state to the said William Burke, that they, the said Charles J. Dalton and Franklin C. Fay, would then and there cause and induce the said journeymen plumbers who had quit the employment of the said William Burke, as aforesaid, not to return to the employment of the said William Burke, and not to resume the work of the said William Burke in and about the erection of the said contract, and that they, the said Charles Dalton and Franklin C. Fay would by the means aforesaid, prevent and hinder him, the said William Burke, in the execution and completion of the said contract, unless he, the said William Burke, would then and there pay to them, the said Charles J. Dalton and Franklin C. Fay, the sum of two hundred ($200) dollars; and the said Charles J. Dalton and Franklin C. Fay then and there, in furtherance of the

said conspiracy, by the means aforesaid, unlawfully, fraudulently and deceitfully did obtain and have of and from him, the said William Burke, two hundred ($200) dollars, lawful money of the United States, all the money and property to him, the said William Burke; against the peace and dignity of the State."

NORTONI, J.—It seems to be conceded that the offense charged in the indictment does not fall within the terms of our statute with respect to the offense of conspiracy. It is obvious the court, in quashing the indictment, proceeded upon the theory that the entire law of this State on the subject of criminal conspiracy is contained in our statutes, secs. 2152 and 2153, R. S. 1899 (secs. 2152 and 2153, Mo. Ann. St. 1906). These provisions are as follows:

"SEC. 2152. *Conspiracy.*—If two or more persons shall agree, conspire, combine or confederate: First, to commit any offense; or second, falsely or maliciously to indict another for any offense, or procure another to be charged or arrested for any offense; or third, falsely or maliciously to move or maintain any suit, or, fourth, to cheat and defraud any person of any money or property, by means which are in themselves criminal; or, fifth, to cheat and defraud any person of any money or property by any means which, if executed, would amount to a cheat, or to obtaining money or property by false pretenses; or, sixth, to commit any act injurious to the public health or public morals, or for the perversion or obstruction of justice, or the due administration of the laws—they shall be deemed guilty of a misdemeanor.

SEC. 2153. *What shall constitute conspiracy in certain cases.*—No agreement, except to commit a felony upon the person of another, or to commit arson or burglary, shall be deemed a conspiracy, unless some act besides such agreement be done to effect the object

thereof, by one or more of the parties to such agreement."

It is insisted, however, that these statutes are not exclusive of other conspiracies cognizable at common law. It is said the common law on conspiracy obtains in this State identically as before the statutes mentioned, except in so far as it is modified by their provisions, and that the indictment sufficiently charges an offense at common law. Unless it be in respect of laws of a general nature, local to the kingdom of England, our statute, sec. 4151, R. S. 1899, sec. 4151, Mo. Ann. St. 1906, provides that the common law and the statutes of England made prior to the fourth year of the reign of James the First, which are not repugnant to our institutions or inconsistent with our Constitution and written laws, are of force and effect in this State. By virtue of these provisions, the common law of England concerning the offense of conspiracy was in force in this jurisdiction long prior to our statute, supra, declaring certain combinations and means employed in furtherance thereof sufficient to constitute a criminal conspiracy. As we shall presently notice, there were numerous combinations to accomplish a purpose by unlawful means, and to accomplish an unlawful purpose by means not unlawful, constituting the offense of conspiracy at common law which are not included in our statute on the subject. And there can be no doubt that the offense charged in the indictment under consideration amounts to a conspiracy under that system of jurisprudence. It therefore appears that unless the common law touching the matter is entirely superseded or abrogated by the statutes above set out, the indictment may be sufficient.

It becomes important then to examine and ascertain whether or not our statute on conspiracy operates a repeal of the common law on the subject. There are three ways in which the common law on a given subject may be repealed. First, by express words to that effect contained in the statute; second, by such repugnance

in the two laws as evinces that they may not both
operate as a rule of decision at the same time; third,
by such a revision of the whole subject-matter of the
former laws as manifests an intention to substitute the
subsequent statute for the prior law. The two latter
methods are regarded as repeals by implication. [Young
v. St. Joe, etc., Railroad Co., 33 Mo. App. 509.] The
law does not favor repeals by implication, however, and
a legislative intent to that effect is not *prima facie*
presumed. Such appeals will not be adjudged to occur
except where they are inevitable, or it is obvious the
legislature intended that result. [Bishop on Statutory
Crimes (3 Ed.), sec. 151; Pacific Railroad Co. v. Cass
County, 53 Mo. 17; State ex rel. v. Severance, 55 Mo.
378; 26 Amer. and Eng. Ency. Law (2 Ed.), 721.]
While this is true, the doctrine is nevertheless thorough-
ly established in Missouri to the effect that even though
no express words are contained therein indicating such
intention, a subsequent statute revising the whole sub-
ject matter of the former law and evidently intended
as a substitute for it, operates a repeal of the former.
[Smith v. State, 14 Mo. 54, 81; State ex rel. v. Patterson,
207 Mo. 129, 145. But see Bishop on Statutory Crimes
(3 Ed.), secs. 158, 163.] This doctrine obtains with
special force where not only the subject-matter is in-
cluded but the common law offense is defined and en-
acted by the subsequent affirmative statute prescribing
the penalty therefor, as in the case of State v. Boogher,
71 Mo. 631. [See also Sutherland, Statutory Construc-
tion (2 Ed.), sec. 251.] Be this as it may, the principle
last adverted to is not pertinent here for the reason the
statute involved does not cover the whole subject of
criminal conspiracy at common law. In such circum-
stances, when the statute contains no express words of
repeal and the common law and a subsequent affirma-
tive statute differ on a given subject, the common law
gives place to or is repealed by the statute only when
the matter is couched in exclusive words or in negative

terms, or the matter of the statute is so clearly repugnant that it necessarily implies a negative. And this we believe to be the proper rule for application to the case in judgment. [1 Blackstone's Comm., 89; 2 Bishop, New Crim. Law (8 Ed.), sec. 175; Bishop, Statutory Crimes (3 Ed.), sec. 153; 26 Amer. and Eng. Ency. Law (2 Ed.), 729; 1 Sutherland on Const. of Statutes (2 Ed.), sec. 248; State v. Norton, 23 N. J. L. 33; Pac. Railroad Co. v. Cass County, 53 Mo. 17; State ex rel. v. Severance, 55 Mo. 378; St. Joe, etc., Railroad Co. v. Shambaugh, 106 Mo. 557.]

In consonance with these principles, the rule obtains that statutes in derogation of the common law are to be construed strictly and as not operating a repeal of the prior law beyond their words or the clear repugnance of their provisions. That is, the new law is treated as replacing the old only in so far as it is directly and irreconcilably opposed thereto in terms. [Bishop on Statutory Crimes (3 Ed.), sec. 155; Casey v. St. Louis Transit Co., 116 Mo. App. 235.] The reasoning of the law is to the effect that when the legislative power professes to add to a former law, as it does by the contribution of an affirmative statute on the subject, it is not permissible to assume for that authority an intention also to subtract from the former law while there remains any admissible rule of the interpretation applicable to the old law, the new law, or both laws, which will enable the two to stand as rules of decision. From an exhaustive examination of the subject, the cases both ancient and modern, reveal numerous combinations to accomplish an end by unlawful means and to accomplish an unlawful purpose by means not unlawful, other than those enumerated in our statute, to have been adjudged sufficient to constitute the offense of conspiracy at common law. This being true, of course the Missouri statutes above quoted do not cover the whole subject-matter as it existed in the old law. There are to be found in those statutes no express

words of repeal of the former rules of decision on the subject. Except for the modification of the common law with respect to requiring the commission of an overt act in furtherance of a conspiracy in certain cases, our statute denounces such acts only as amount to a conspiracy at the common law. At the same time, it omits to either include or exclude other combinations sufficient to constitute an offense under the old system of jurisprudence. It is an affirmative statute. [Bishop, Statutory Crimes (3 Ed.), secs. 153, 154.] It seems to affirm the doctrine of the common law so far as it goes, except with respect to the modification as to the overt act before mentioned. It supersedes so much of the common law only as is repugnant to it, after harmonious interpretation. Otherwise than as to requiring the doing of an overt act, the statutes are not in conflict nor repugnant to the common law of conspiracy. They contain no words signifying an intention on the part of the Legislature that the combination and means therein denounced shall be exclusive of other combinations and means constituting an offense at common law. The statutes are not couched in negative terms nor is their matter so repugnant to the prior law on the subject as to clearly imply that they negative all the combinations and means constitutive of conspiracy theretofore existing. Therefore, under all of the rules of interpretation with which we are familiar, it appears that our statutes on conspiracy amount to no more than a modification of the common law on the subject as indicated, and in no manner superseded it or operate a repeal of its rule with respect to other conspiracies not included in the terms of the statute. The reasoning above indicated has been applied with like effect to the original and most ancient statute touching the matter of conspiracies. The statute referred to is as follows:

"Conspirators be they that do confederate or bind themselves by oath, covenant, or other alliance, that every of them shall aid and bear the other falsely and

maliciously to indict, or cause to indict, or falsely to move or maintain pleas; and also such as cause children within age to appeal men of felony, whereby they are imprisoned and sore grieved: and such as retain men in the country with liveries or fees for to maintain their malicious enterprises (and to drown the truth); and this extendeth as well to the takers as to the givers. And stewards and bailiffs of great lords, which by their seigniory, office, or power undertake to bear or maintain quarrels, pleas, or debates that concern other parties than such as touch the estate of their lords or themselves. This ordinance and final definition of conspirators was made and accorded by the king and his counsel in his Parliament the thirty-third year of his reign." (33 Edw. 1, stat. 2; sometimes cited as 21 Edw. 1.) [2 Bishop, New Crim. Law, sec. 174. See also 1 Hawkins, Pleas of the Crown, 444, sec. 1.]

The most respectable and accurate authorities on the question concur in the view that this statute did not abrogate the prior common law on the subject. It is said that the existence of other punishable conspiracies than those which it enumerates are not superseded thereby, and that the common law in respect of conspiracy continues to obtain, notwithstanding the statute. This for the reason the statute is neither repugnant to nor inconsistent with the common law. The authorities argue the mere fact that certain acts which were not known prior thereto to constitute conspiracy are declared by the statute to constitute the offense, cannot render other acts not mentioned no longer criminal. And it is said one act which in law amounts to an offense will not cease to be such because another act is merely declared by statute without negative words or clearly implied negative intention, to amount to the same. See the noted case of State v. Buchanan, 5 Har. & J. (Md.) 317, 9 Amer. Rep. 534, 547; State v. Norton,

23 N. J. L. 33, 3 Zab. 33, 40, 42; State v. De Witt, 2 Hill (S. C.) 282, 27 Amer. Rep. 371, 372. As illustrative, see Sydenham v. Keilaway, Cro. Jac. 7 Pl. 9; 2 Bishop New Crim. Law (8 Ed.), sec. 174. Although not conclusive, other very satisfactory reasons may be offered as well, which tend to support the conclusion that the Legislature did not intend an entire repeal of the common law on the subject of conspiracy. Another section of our statutes provides that punishments by virtue of the common law shall in no wise be other than by fine or imprisonment, or both, and such fine shall not exceed $100, and the terms of such imprisonment shall not exceed two months. [Sec. 4152, R. S. 1899; sec. 4152, Mo. Ann. St. 1906.] Here is a clear manifestation of a legislative intention to the effect at least that common law offenses may continue to exist in this State when not excluded by the provisions of our criminal code.

It appears also from an historical examination that the pioneer statutory enactment on the subject of conspiracy in this country is that of New York, after which many of the States have followed (2 Bishop, New Crim. Law (8 Ed.), secs. 237, 239; People v. Fisher, 14 N. Y. 9, 14; 28 Amer. Dec. 501; State v. Norton, 23 N. J. L. 33; 3 Zab. 33). Our statutes on the subject are largely patterned thereafter, although not in the precise verbiage. The New York statutes touching the question of conspiracy are sections 168, 169, and 170 and 171 of the New York Criminal and Penal Code. By a comparison of our own statute (sec. 2152, supra), with section 169 of the New York code it appears that, after omitting the fifth subdivision of the New York section, our statutory provisions are substantially the same on the subject; while our section 2153, introducing the innovation and modification of the common law in respect to the overt act, except for the use of two dissimilar words which in no manner change its sense, is identical with section 171 of the New York code on the same subject. There is a notable distinction, however, in respect to the

expressed intention of the Legislature of New York and the Legislature of Missouri on the question of what should be deemed a conspiracy thereafter. It appears by section 170 of the New York code, that no conspiracies other than those enumerated in the statutes, should thereafter be treated as criminal in that State. The New York statute recites that, "No conspiracy is punishable criminally unless it is one of those enumerated in the last two sections." No such provision is found in the Missouri code. While engaged in patterning a statute in a large measure after that of New York, the omission of this clause is indeed highly significant of an intent on the part of our Legislature to not exclude all other conspiracies at common law. This view likewise has been advanced on the same subject in an able and exhaustive opinion by the Supreme Court of New Jersey in the case of State v. Norton, 23 N. J. L. 33; 3 Zab. 33. [See also 2 Bishop, New Crim. Law (8 Ed.), sec. 237.]

To examine, then, the offense of conspiracy. It is indeed difficult to formulate an accurate definition of conspiracy at common law which will incorporate all of the acts punishable under this description, without including as well acts which may not be punishable. Therefore, in Commonwealth v. Hunt, 4 Metc. (Mass.) 111, 123, Chief Justice SHAW said: "Without attempting to review and reconcile all the cases, we are of opinion, that as a general description, though perhaps not a precise and accurate definition, a conspiracy must be a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." [See also 2 Bishop, New Crim. Law (8 Ed.), sec. 171, 175; 6 Amer. and Eng. Ency. Law (2 Ed.), 831, 838; Hart v. Hicks, 129 Mo. 99, 104.] The gist of the offense at common law is a corrupt combination which involved an infringement of the law either in accomplishing the

end contemplated or the means to be employed in attaining the end to which the confederation is directed. Therefore the offense was complete and punishable even though no act was done in furtherance of the conspiracy. From these considerations, it appears, of course, that a conspiracy was a substantive offense at common law, though nothing be done in execution of it. [State v. Buchanan, 5 Har. & J. (Md.) 317, 9 Amer. Rep. 534; 2 Bishop, New Crim. Law (8 Ed.), sec. 192; Poulterer's Case, 9 Co. 55b, 56b, 57a; Reg. v. Best, 1 Salk, 174, 2 Id. Raym. 1167; Rex v. Kinnersley, 1 Star. 193; Rex v. Rispal, 3 Burr. 1320; Heyman v. Reg. Law Rep. 8 Q. B. 102, 105; 12 Cox C. C. 383; 2 Bishop, New Crim. Law (8 Ed.), secs. 171, 172, 173, 190, 192; State v. Straw, 42 N. H. 393; State v. Pulle, 12 Minn. 164; Comm. v. Judd, 2 Mass. 337; Comm. v. Hunt, 4 Metc. (Mass.) 111, 125.] Aside from the present statutory provisions requiring the commission of an overt act in certain cases, acts in execution of a conspiracy are alleged in the indictment and received in evidence as tending to elucidate the intention of the parties or in aggravation of the unlawful combination only. [Comm. v. Hunt, 4 Metc. (Mass.) 111, 125; Comm. v. Judd, 2 Mass. 337; State v. Buchanan, 4 Har. & J. (Md.) 317, 9 Amer. Rep. 534; 2 Bishop, New Crim. Law (3 Ed.), sec. 203.]

From what has been said, it will appear the offense of conspiracy may arise from a corrupt confederation with an unlawful purpose in either one of two ways. The offense may be complete under the old law, first, if the confederation be to do, by concert of action, either direct or remote, a criminal or unlawful act by any means, whether unlawful or not; or second, to do an act not in itself criminal or unlawful, by criminal or unlawful means. It will be observed that the statement of the doctrine includes either a criminal or unlawful end or the employment of criminal or unlawful means. On this statement there arises for consideration, in a more or less remote degree, the question as to what

character of unlawful purpose or what character of unlawful means contemplated by the conspirators will be sufficient to infuse into the confederation the elements of criminal conspiracy.

There can be no doubt whatever on the question of conspiracy when the parties combine to violate the criminal law. Of course in every case where the confederation is for the purpose of doing, by direct or remote concert, an act which would amount to a criminal offense if done by one of the parties, notwithstanding the confederation, the offense is complete. [State v. Buchanan, 5 Har. & J. (Md.) 317, 9 Amer. Rep. 534; 6 Amer. and Eng. Ency. Law (2 Ed.), 848, 852.] And it is said by Mr. Bishop (2 Bishop, New Crim. Law (8 Ed.), sec. 178) that the term unlawful in this connection, "signifies neither 'indictable' nor 'criminal' though it includes both, but it means 'contrary to law,' which may be the law of the criminal courts or of the civil." [See also 2 Bishop New Crim. Law (8 Ed.), sec. 172; Reg. v. Warburton, Law Rep. 1 C. C. 274, 276; State v. Norton, 23 N. J. L. 33, 3 Zab. 33; 6 Amer. and Eng. Ency. (2 Ed.), 849, 850.] However, the term "unlawful" is comprehensive indeed, and the important question with which the court is concerned arises therefrom. The question suggests the thought: is the word "unlawful," when thus employed, to be interpreted in the full measure of its significance? Sergeant Hawkins seems to have entertained the view that in considering the purpose to be effected by the conspirators the word "unlawful" should be given its most comprehensive significance. He says that "all conspiracies, whatsoever, wrongfully to prejudice a third person, are highly criminal at common law." [1 Hawkins, Pleas of the Crown, 446.] The statement is nevertheless somewhat modified by his illustrations. In view of the authorities, eminent judges have expressed grave doubts touching the accuracy of this broad assertion of the doctrine. [Comm. v. Hunt, 4 Metc. (Mass.) 111; State v. DeWitt, 2 Hill (S. C.)

282, 27 Amer. Rep. 371, 373.] Although trespass was unlawful at common law, the court was of the opinion, in the King v. Turner, 13 East. 228, that a combination to commit a trespass upon the land of another, was not sufficient to sustain an indictment for conspiracy. [See also 2 Bishop, New Crim. Law (8 Ed.), sec. 182; Comm. v. Hunt, 4 Metc. (Mass.) 111, 124, 125.] However this may be, other courts have given expression to another view on the subject, and we think properly so, if for no other reason than on the principle of enhanced power to commit mischief arising from the confederation. In those cases, judgments have been given to the effect that where persons had confederated together for the purpose of entering upon the premises of another and to hold possession of the same, the purpose was sufficiently unlawful to infuse the confederation with the element of criminal conspiracy. [Wilson v. Comm., 96 Pa. St. 56. See also Rex v. Mawbey, 6 T. R. 628; Reg. v. Rowalds, 17 Q. B. 686, 79 E. C. L. 686; State v. Straw, 42 N. H. 393; 6 Amer. and Eng. Ency. Law (2 Ed.), 854.] It has been said, however, by a court of high authority, that when the principle touching a mere unlawful end comes to be fully developed, it will probably be found to preclude indictment for conspiracy in those cases of trespass not affecting the person for which an action at law would afford adequate relief, if the intention of the conspirators was consummated by means not unlawful. [State v. DeWitt, 2 Hill (S. C.) 282, 27 Amer. Rep. 371.] While from an examination of the authorities it may be asserted as true that the precise limits of the rule with respect to the terms "unlawful purpose" or "unlawful means" in cases where neither the purpose to be achieved nor the means to be employed, are actually criminal, has never been clearly defined, the authorities assert and sustain a doctrine commensurate at least with the exigencies of the case now under consideration. The doctrine referred to arises from the additional power or enhanced

State v. Dalton and Fay.

ability to accomplish a result which is in many cases present in the combination of several to the same end. In some degree, the principle pervades the entire law of conspiracy.. It may be stated as a general proposition that where an additional power or enhanced ability to accomplish an injurious purpose arises by virtue of the confederation and concert of action, an element of criminal conspiracy is thereby introduced which will render sufficiently criminal either the means or the purpose otherwise merely unlawful, to sustain a conviction, although the means or the end were not such as are indictable if performed by a single individual. [Commonwealth v. Waterman, 122 Mass. 57; Commonwealth v. Judd, 2 Mass. 329, 337; State v. Burnham, 15 N. H. 396; 2 Bishop, New Crim. Law (8 Ed.), secs. 180, 195; 3 Chitty, Crim. Law, 1139; 6 Amer. and Eng. Ency. Law (2 Ed.), 851; Twitchell v. Commonwealth, 9 Pa. St. 211 and remarks, 212.]

There can be no doubt that the facts alleged in either count of the indictment present a case falling within the influence of the principle last stated. The indictment in the first count charges in substance that the defendant conspired to, and in execution of the conspiracy, induced certain mechanics to quit the employ of William Burke, and would not permit them to enter again in his employ although he was in sore need of their services, until Burke had first paid to the defendants $200 to withdraw their influence in that behalf, and that their purpose was to thus unlawfully exact $200 from Burke; which he paid. The second count charges in substance that the mechanics mentioned voluntarily quit the employ of Burke and that defendants corruptly conspired to and did so influence them as to prevent their return to his employ, although he was in great need of their services, unless Burke paid the defendants $200 to withdraw their influence, and that their purpose was to thus unlawfully exact $200 from Burke; which payment he made, etc. From all

that appears in the indictment, the means employed by the defendants were entirely lawful. It is certainly true that if the parties are not under contract (nothing appearing to the contrary, the presumption is they were not) their associates and friends may counsel and advise them to quit or continue a particular service, or having quit the service, as in the second count mentioned, not to return thereto except upon reasonable and proper conditions. [Thomas v. C. N. O. & T. Railroad (in re Phelan), 62 Fed. 803, 817, 818; Wabash Railroad v. Hanahan, 121 Fed. 563.] It is otherwise, however, with respect to the alleged purpose sought to be effectuated in either count of the indictment. It is the policy of our enlightened system of jurisprudence to insure and protect the freedom of contract in its largest measure, subject only to certain restraints imposed by a wise public policy of a still higher and more holy nature. To leave men free to choose their own occupation and contract with whomsoever they will in their particular field of industry, without restraint or interference from others, tends not only to elevate their condition by fostering a spirit of independence and ambition, but secures as well to skill and industry a proper recompense in recurring advantages, too numerous to mention. The common law has never tolerated a species of interference by third persons for a purpose such as that disclosed in the allegations of the indictment. Although one may lawfully induce another to quit a particular service, or not return to the employ of a particular person, there can be no doubt, even when no contract of employment is breached thereby, that it is unlawful for third parties, as charged in the first count, to interfere and induce employees to quit their employer and not to return to his services, for the purpose of exacting and extorting from him a sum of money against his consent. And it is equally clear where men are unemployed, as were the mechanics mentioned in the second count to have quit the service, that it is unlawful

for a third person to interefer with the freedom of contract and, by persuasion or other means, for the sole purpose of exacting or extorting a sum of money from the employer against his consent, prevent the consummation of a new contract of. employment. When one, upon whom there rests no legal obligation to do so, is thus coerced, by threat, reasonable apprehension, or fear of suffering injury to his business, to contribute his means to another who has no moral or legal right to insist upon such payment, the most elementary principles of natural justice, inherent in the common law, denounce the act as unlawful and afford a remedy certain and sure. [Carew v. Rutherford, 106 Mass. 1, 13, 14; 8 Amer. Rep. 287; March v. Bricklayers, etc., Union, 4 L. R. A. 1198, 63 Atl. 29. See also 28 Am. & Eng. Ency. Law (2 Ed.), 141.] Although the act of procuring money from another under the circumstances stated may not be a criminal offense either at common law or under the statute, it is palpably unlawful, and an action in tort will lie in favor of the injured party for its recovery, as is affirmed in the authorities supra. This being true, the purpose of the conspiracy is obviously unlawful in the sense essential to infuse an element of criminal liability therein, as contemplated by the entire doctrine of our law in respect of conspiracy and conspirators. A single individual, acting alone to the same end, would indeed be less bold and more likely to recede from a sense of insecurity in his venture. And then, too, the ability of one person to coerce the subject of his design would be less potent. The additional power and enhanced ability arising from a confederation of two persons to overawe and coerce an ordinary man to part with his means against his will, under the circumstances alleged in the indictment, is obvious. Therefore we conclude that although the purpose sought to be effectuated and to which the conspiracy was directed, may not, in and of itself, amount to an offense against the criminal laws, if committed by a

single individual, it is an unlawful purpose possessed of an element essential to a criminal conspiracy in such cases. This for the reason of the additional power and enhanced ability to accomplish the contemplated mischief, which accrued in virtue of the federation.

The indictment alleges in each count that the purpose of the conspiracy was actually accomplished and sets out sufficient facts from which an overt act, essential in the law as modified by our statute, appears. This being true, it charges an offense at common law as modified by our statute touching the commission of some overt act in case of conspiracies other than those to commit a felony upon the person of another, or to commit arson or burglary. [Sec. 2153, R. S. 1899; sec. 2153, Mo. Ann. St. 1906; State v. Truenell, 79 Mo. App. 243.]

The remaining questions suggested in the briefs do not merit the attention of the court. The judgment should be reversed and the cause remanded. It is so ordered. *Bland, P. J.,* not sitting; *Goode, J.,* concurs.